THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANITA CHURCHILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 08 C 1099 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anita Churchill moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse the final decision of the Commissioner of the Social Security Administration (Commissioner), who denied her claim for Period of Disability (POD), Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). *See* 42 U.S.C. § 401 *et seq*; 42 U.S.C. § 416(I); 42 U.S.C. § 423; 42 U.S.C. § 1381 *et seq*; 42 U.S.C. § 1614 (West 2008). In the alternative, Plaintiff seeks an order remanding the case to the Commissioner for additional proceedings. Defendant moves to affirm the decision of the ALJ that Plaintiff is not disabled. For the reasons set forth below, the Court denies Plaintiff's Motion for Summary Judgment and grants the Commissioner's cross-motion for summary judgment.

## Procedural History

On March 8, 2005, Ms. Churchill filed an application for
POD, DIB, and SSI, alleging disability beginning November 1,
2003.[1]  (R. at 113, 211.)  She asserted that asthma, a seizure
disorder, and knee pain rendered her disabled.  (R. at 585.)  Her
claims were initially denied on April 25, 2005.  (R. at 621.)  On
June 9, 2005, Plaintiff filed a Request for Reconsideration,
which was denied on July 21, 2005.  (R. at 83.)

On September 21, 2005, Ms. Churchill requested a hearing
before an Administrative Law Judge (ALJ).  (R. at 72.)  A hearing
was held on July 10, 2007, before ALJ Helen Cropper.[2]  (R. at 12-
35, 647.)  Following the hearing, the ALJ issued an unfavorable
decision, finding Plaintiff not disabled at any time through
September 25, 2007, the date of the ALJ's decision.  (R. at 12-
35.)  Plaintiff subsequently filed a request for review of the
ALJ's decision with the Social Security Administration's Appeals
Council (Appeals Council).  (R. at 8A.)  However, the Appeals
Council denied the request on December 27, 2007.  (R. at 6.)

---

[1]  Ms. Churchill also filed applications on January 16, 2003
and April 22, 2004; on these documents, she listed her alleged
disability onset date as December 17, 2002 and November 1, 2003,
respectively.  (R. at 87, 91, 612.)  Though these claims were
subsequently denied, she failed to request a hearing on either
application.  (R. at 77.)

[2]  A hearing was initially held on May 1, 2007.  (R. at 629-
46.)  As the ALJ lacked sufficient medical records to allow her
to conduct a "good hearing," it was rescheduled for July 10,
2007.  (R. at 640.)

Consequently, the ALJ's decision stands as the final
administrative determination of the Commissioner. (*Id.*)

## Factual History

### 1. Plaintiff's Testimony

Anita Churchill testified that she was born on January 28,
1949, and was 58 years old at the time of the hearing. (R. at
661.) She stands approximately 5 feet 2 inches tall and weighs
180 pounds. (R. at 134, 711.) She does not drink alcoholic
beverages. (R. at 697.) Plaintiff is married; her youngest
daughter and three small grandchildren live with her. (R. at
661-63.)

Ms. Churchill stated that she completed the eighth grade.[3]
(R. at 667.) For ten years, she worked in multiple capacities at
Avis Rent A Car (Avis). (R. at 676, 684.) Indeed, for a period
of time she labored as a car transporter, driving cars to
different locations; she experienced no difficulties performing

---

[3] There are a number of discrepancies between Ms.
Churchill's testimony regarding her education and documentation
contained in the record. For example, she testified that the
highest grade completed was the eighth grade. (R. at 667.) And
consistent with this testimony are statements made to Dr. Puntini
that she dropped out of school in the ninth grade. (R. at 556.)
However, she indicated on forms completed in January and June
2003, that she finished the tenth grade – an assertion also made
to Dr. Gross. (R. at 138, 145, 164, 256.) But on records dated
April 2004, Plaintiff listed the twelfth grade as the highest
grade that she completed. (R. at 209.) Further, though she told
Dr. Puntini and even testified that while in school she was
enrolled in special education classes, forms from January and
June 2003 and April 2004 denote the contrary. (R. at 138, 146,
164, 209, 556, 670.)

3

this job. (R. at 676.) She also worked as a security guard whereby she checked customer contracts and licenses prior to allowing patrons to remove rental vehicles from Avis' parking lot. (R. at 683-84.) Additionally, Plaintiff sold cars and also performed other tasks for this employer, though she could not remember what they were. (R. at 685-86.) She subsequently left to care for her ailing grandmother. (R. at 676-77.)

Ms. Churchill indicated that, after leaving Avis, she began working as a receptionist for Dr. Julian Amado; when the doctor sold the building to Dr. Chada, she continued her employ for the new physician. (R. at 675-76.) She later worked in the same role (from 2003-2005) for Dr. T.H. Sung.[4] (R. at 676.) As a receptionist for all three doctors, Plaintiff's job responsibilities were the same – pull charts, answer telephones, greet patients, and schedule appointments; her job required that she sit for the majority of the workday. (R. at 673-74, 680.) Plaintiff enjoyed the work and had no problem performing her duties. (R. at 673-74.) Supporting this is her assertion that she never missed a single day of work while employed by Dr. Sung.[5] (R. at 710.) She continued working until her seizures

---

[4] As will be seen *infra*, Dr. Sung also treated Plaintiff for her asthma. (R. at 674.)

[5] This is in contrast to the information provided by Ms. Churchill's counsel. Indeed, in a letter to the ALJ dated May 1, 2007, Plaintiff's attorney indicated that before Plaintiff stopped working "she missed at least two days of work a month."

4

became "bad," which coincided with her grandmother's death in November 2003.[6] (R. at 677, 681-82.)

When discussing her physical limitations and impairments, Ms. Churchill testified that she suffers from asthma. (R. at 706.) Though it bothers her often, the prescription medication that she takes helps to alleviate it; however, it is exacerbated by heat and damp weather. (R. at 706-07.) Fumes from motors, dust, and pollen also adversely affect this condition. (R. at 707.)

Additionally, Ms. Churchill stated that, once a month, she experiences seizures that "drain her body." (R. at 694, 702.) These seizures can occur at any time and place and leave her unable to do anything for more than a month after each seizure occurs. (R. at 703, 711.) Because she has never run out of her anti-seizure medication nor forgotten to take a dose, she is unsure as to why the medication levels in her bloodstream are sometimes low upon her admission to the hospital for treatment. (R. at 694.) Plaintiff experienced her last seizure during the month preceding the hearing. (R. at 704.)

Ms. Churchill indicated that she experiences problems with

---

(R. at 368-69.)

[6] Though Plaintiff testified that she stopped working when she began experiencing seizures, and that the seizures began when her grandmother passed, her testimony reveals that she worked for an undisclosed period, even after the death of her grandmother. (R. at 683.)

5

both her knees. (R. at 695.) Specifically, she suffers from arthritis in her left knee and a blood clot in her right. (*Id.*) Because the arthritis causes pain, which worsens when it is damp outside, she sometimes takes prescription pain medication; she also takes prescription medicine for the blood clot in her right knee. (R. at 695-97.)

Ms. Churchill testified that she sometimes believes that she suffers from emotional problems. (R. at 692.) Though she has never been treated for such, she reported it on two occasions to Dr. Lafayette Singleton, her neurologist. (R. at 692-93.) The first time, the doctor failed to take any action; a month prior to the hearing, however, he advised her that it was a side effect of one of the medications that she takes for her seizure disorder. (R. at 693.) Dr. Singleton prescribed additional medication which is "helping a little," and suggested that she schedule a follow-up appointment with him. (R. at 693-94.) Plaintiff also started to feel "down" all of the time when she began experiencing seizures; this condition continues to worsen. (R. at 694, 707.) Additionally, Ms. Churchill does not sleep well at night – she wakes and is unable to go back to sleep. (R. at 708.) Consequently, she feels "terrible" the following day and must take frequent naps. (*Id.*) Further, she has lost her appetite and only eats so that she can take her medication. (*Id.*)

6

Ms. Churchill indicated that she typically begins her day at 6:00 a.m. by reading a verse from her Bible. (R. at 698.) After making something to eat, she takes her medication; helps dress her grandchildren for daycare; and assists her daughter in preparing for nursing school. (R. at 666, 698.) For the remainder of the day, Plaintiff straightens the inside of her apartment and sometimes cleans the common areas inside and outside of the building in which she resides. (R. at 664, 699-700.) Lastly, she prepares dinner. (R. at 699.) She is capable of lifting a gallon of milk, a case of soda, and her one-year-old grandson. (R. at 705.) Further, though her hands periodically shake, she has no difficulty using her hands and fingers. (R. at 706, 710.)

Ms. Churchill testified that she and her daughter do the laundry and go grocery shopping together. (R. at 699.) And though she used to babysit her grandchildren, since the onset of her seizures, she is no longer able to do so. (R. at 699-700.) Nor has she driven a car since her seizures began; she uses public transportation, family members, and friends to take her to the places that she needs to go. (R. at 672, 692.) She enjoys walking and is able to walk for two blocks; however, she can stand no more than two hours before she will need to sit down. (R. at 701, 705-06.) She also likes attending weekly church service, which typically lasts from 11:00 a.m. until 2:30 p.m.;

she is comfortable when seated (R. at 701, 706.) Plaintiff sings in the church choir and goes to weekly choir rehearsals. (*Id.*) She also participates in church picnics. (R. at 701-02.)

Ms. Churchill stated that she does not feel as though she is able to work because, following her employment with Dr. Sung, she began having difficulty remembering things. (R. at 687, 689.) For example, she often locks herself out of her house because she puts her keys down but is unable to remember where she left them. (R. at 688-89.) She reported this to Dr. Singleton, who prescribed medication in an effort to treat this condition; at the time of the hearing, Plaintiff had not been on the medicine long enough to determine whether it was having the desired effect. (R. at 689.)

## 2. Vocational Expert's Testimony

Mr. Thomas Dunleavy, a vocational expert (VE), testified at Plaintiff's hearing. (R. at 712.) Based upon Ms. Churchill's testimony regarding her work as a receptionist, Mr. Dunleavy opined that, though the job requires detailed work, the work is sedentary and semi-skilled, with a Specific Vocational Preparation (SVP) rating of three. (R. at 717-18, 721.) The job as performed by Plaintiff, requires that an employee read at an eighth-grade level. (R. at 719.) Further, he stated that Plaintiff's position as car transporter with Avis was a light and unskilled composite job, necessitating the ability to read at a

8

sixth-grade level. (R. at 718-19.)

The ALJ described to Mr. Dunleavy a fifty-eight-year-old individual with a tenth-grade education with past relevant work experience as both a receptionist and car transporter. (R. at 719-20.) The hypothetical person, the ALJ said, "has the residual functional capacity to perform the full range of work at the light exertional level." (R. at 720.) However, the person is limited in that she should not do constant repetitive pushing or pulling against resistance with her lower left extremity; should never climb ladders, ropes, or scaffolds or work on surfaces that are moving or unstable; can only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; and should not be exposed to extremes in temperature, humidity, irritants, unprotected heights, or unguarded hazardous equipment. (*Id.*) The VE responded that the hypothetical individual could perform the job of medical receptionist. (*Id.*) The ALJ then asked the VE to further assume that the hypothetical person was limited to sedentary work. (*Id.*) Again, Mr. Dunleavy concluded that the hypothetical individual could work as a receptionist. (*Id.*)

## 3. **Medical Evidence**

Plaintiff submitted medical records to the ALJ detailing her treatment. The Court will discuss these records in full.

### A. *Cook County Bureau of Health Services*

On April 9, 2003, Ms. Churchill visited the Fantus Health

9

Center (Fantus) neurology clinic for the first time. (R. at 358.) She told Dr. Singleton that she had suffered at least four seizures since December 2002. (*Id.*) She was instructed to have a magnetic resonance imaging (MRI) scan and electroencephalogram (EEG) test performed and to continue her medication. (*Id.*) On April 17, 2003, Plaintiff had an EEG performed which showed "[n]ormal EEG in wake and drowsiness." (R. at 359.)

Ms. Churchill returned to Fantus on May 28, 2003, at which time she reported that she had not experienced a seizure since December 2002; she was told to continue her medication. (R. at 357.) On August 27, 2003, she again visited the center for a follow-up and was advised to return in two months. (R. at 355.) She visited on September 29, 2003, complaining of memory problems and stiffness during seizures. (R. at 356.) Because she had experienced a seizure during the previous week, she was advised to have an MRI scan done. (*Id.*)

During a visit on November 3, 2003, Ms. Churchill informed Dr. Singleton that she had suffered a seizure the month before. (R. at 353.) He instructed her to have her Dilantin level checked and to continue with her medication. (*Id.*) She returned on December 8, 2003, because she was experiencing an increase in the frequency of her seizures. (R. at 354.) Indeed, she reported that she had suffered four seizures in a single day. (*Id.*) Plaintiff stated that she had been hospitalized three

10

times for seizures over the last year. (*Id.*) In addition, she complained of being depressed. (*Id.*) Plaintiff was prescribed an additional anti-seizure medication. (*Id.*)

On February 9, 2004, Ms. Churchill had a follow-up appointment with Dr. Singleton regarding her seizures. (R. at 352.) She stated that she had suffered a seizure during the previous month; she indicated that she had not had the prescription filled for Keppra, one of her seizure medications. (*Id.*) Plaintiff reported that she feels drowsy if she takes all of her medications together. (*Id.*) She again visited the medical facility on May 10, 2004, and indicated that she had suffered a seizure the month before. (R. at 351.) On August 16, 2004, Plaintiff told Dr. Singleton that she had suffered two seizures since her last visit. (R. at 350.)

During a follow-up visit on November 22, 2004, Ms. Churchill stated that her last seizure had occurred in August 2004. (R. at 349.) She also informed the nurse that she sometimes forgets to take her medication. (*Id.*) Plaintiff had another appointment on January 31, 2005; she indicated that her last seizure occurred seven months prior to the visit. (R. at 348.) On May 2, 2005, Plaintiff visited the clinic and reported that she had suffered a seizure in April. (R. at 405.) Though she denied noncompliance with her medication, the nurse noted that Plaintiff was unable to recognize one of the seizure medications that she was allegedly

11

taking. (R. at 405.) Ms. Churchill reported on August 8, 2005, that she had not had a seizure since her last visit to the clinic. (R. at 404.)

Plaintiff returned to the clinic on August 17, 2005, and reported that she had been recently hospitalized as a result of a seizure. (R. at 403.) She was told to have her Dilantin level checked and to return in one week for a follow-up. (*Id.*) She returned on August 29, September 7, October 3, and October 17, 2005, and each time reported no recent seizures. (R. at 399, 400, 401, 402.) However, during her visit on October 24, 2005, Plaintiff complained of suffering two "bad seizures" about a month prior to her visit to the clinic. (R. at 398.) She stated that she regularly takes her medication. (*Id.*)

On November 7, 2005, Ms. Churchill had a follow-up appointment and reported that she had suffered a seizure two weeks earlier. (R. at 397.) She saw Dr. Singleton on November 14 and December 5, 2005, and January 4, 2006. (R. at 394, 395, 396.) During each visit, she reported no recent seizures. (*Id.*) On September 25, 2006, Ms. Churchill visited the clinic for a follow-up; she had experienced a seizure five days prior to her appointment. (R. at 393.) She was told to continue her medication. (*Id.*) When she visited Dr. Singleton on November 20, 2006, she informed him that she had been hospitalized as a result of a seizure; she had not had a seizure since the

12

hospitalization. (R. at 392.) Ms. Churchill had an appointment
at the clinic on December 20, 2006. (R. at 391.) She had not
suffered any new seizures. (*Id.*) Plaintiff visited Dr.
Singleton on January 17, 2007; she had not suffered a seizure
since her last visit. (R. at 390.) Ms. Churchill again saw Dr.
Singleton on April 11, 2007. (R. at 389.) At that time, she
indicated that her last seizure occurred in February 2007. (*Id.*)

## B. May Medical Center[7]

During a routine visit to the May Medical Center on February
26, 1999, Dr. Conrad May noted that Ms. Churchill's left knee was
swollen; as a result, she was using a cane to ambulate. (R. at
253.) Additionally, he documented that Plaintiff was wheezing
during the visit; his assessment was that she suffers from
asthma. (*Id.*) She returned on April 16, 1999, complaining of
right knee pain, and again on June 18, 1999, for discomfort and
swelling of the same knee. (R. at 252-53.) On both days, she
was diagnosed as having degenerative joint disease. (*Id.*) When
she visited the center on March 9, 2002, the doctor again
assessed her as suffering from asthma. (R. at 252.)

Ms. Churchill returned to the clinic on January 2, 2004,

---

[7] In addition to visiting May Medical Center for problems
with her knees, Ms. Churchill received physical therapy at Rush
University Medical Center. Indeed, the record is replete with
records documenting her treatment. However, because these
records generally offer nothing beyond that included in the
records of the treating physicians, these visits will not be
discussed in great detail.

after falling and sustaining an injury to her left leg. (R. at 544.) Not only was her leg swollen and painful, it was also tender. (Id.) She returned on March 13, 2004, because the fall resulted in her experiencing bilateral knee pain. (Id.) On June 15, 2004, she complained of left knee pain and when she visited on November 26, 2004, the same knee was also swollen. (R. at 545-46.) Left knee pain brought her back to the medical center on four consecutive occasions -- March 1, March 30, June 7, and July 19, 2005. (R. at 546-48.)

Ms. Churchill visited the clinic on September 28, 2005, for a follow-up visit after being seen in the emergency room. (R. at 549.) She again complained of her left knee on April 14, May 31, July 7, and August 18, 2006. (R. at 549-551.) On November 13, 2006, Ms. Churchill visited the center after being hospitalized. (R. at 552.) And on January 9 and February 21, 2007, she presented with complaints of knee pain. (R. at 553.) However, on April 16, 2007, she reported that she was not experiencing any aches and pains and that she felt fine. (R. at 554.) She visited the center on May 9, 2007, complaining of a seizure that occurred a couple of days prior to the visit. (Id.)

## C. Mt. Sinai Hospital Medical Center

On December 17, 2002, Ms. Churchill was seen in the Mt. Sinai emergency room after suffering her first ever seizure -- believed to have resulted from her overuse of asthma medication;

14

while there, she suffered yet another. (R. at 284, 290, 291, 300.) Additionally, though her asthma was stable, the doctor noted wheezing. (R. at 289-90.) Consequently, her diagnoses were listed as new onset seizure and asthma. (R. at 324.) An examination also revealed that Ms. Churchill was experiencing bilateral lower extremity swelling and tenderness behind both knees. (R. at 289.) And it was noted that Ms. Churchill was under an immense amount of stress as a result of her grandmother's death that occurred in November 2002. (R. at 288.)

During her visit, Ms. Churchill underwent a battery of tests. Specifically, she had an MRI scan performed of her brain, which revealed that her pituitary gland was slightly enlarged "with slight deviation of the pituitary stalk to the left of midline and a very tiny area of lack of enhancement within the pituitary gland on the left." (R. at 293.) Additionally, a computed tomography (CT) scan of her brain was unremarkable. (R. at 294.) The results of an EEG were "abnormal because of rare but definite bifrontal sharp waves denoting epileptic discharges." (R. at 317.) Further, a chest and lateral x-ray performed of the posterioranterior (PA) and lateral views revealed a "[s]mall left pleural effusion." (R. at 295.) Plaintiff had her Dilantin levels checked on December 19 and December 20; the levels were 5.8 $\mu$g/mL and 10.4 $\mu$g/mL,

respectively.[8]  (R. at 312.)  She was discharged on December 21, 2002, with instruction not to abuse her asthma medication.  (R. at 315, 325.)

On January 3, 2003, Ms. Churchill was seen at the hospital after having suffered a seizure; she stated that she had not missed any doses of her anti-seizure medication, Dilantin.  (R. at 279.)  A blood test revealed that Plaintiff's Dilantin level was 13.4 $\mu$g/mL.  (R. at 307.)  The treating physician opined that her seizure disorder was likely exacerbated by "alpha-adrenergic substances taken for her asthma in very high dose."  (R. at 279.)  Upon discharge, she was advised to continue taking Dilantin and to have both her Dilantin level and blood count checked.  (*Id.*)

Pain and swelling in her knees led Ms. Churchill to have bilateral knee x-rays done on February 4, 2003, which revealed degenerative changes in her right knee and "[f]luid in the joint capsule with periosteal reaction in the upper tibia," in her left.  (R. at 278.)  It was the radiologist's recommendation that Plaintiff have an MRI scan done of both knees.  (*Id.*)

On March 3, 2003, Ms. Churchill visited the emergency department complaining of, *inter alia*, shortness of breath with minimal exertion.  (R. at 267.)  While there, she informed emergency room personnel that she has a history of asthma.  (*Id.*)  Additionally, she stated that she suffers from a seizure

---

[8] The therapeutic, normal, range is 10.0 - 20.0 $\mu$g/mL.

disorder, having experienced her first seizure in December 2002. (*Id.*) Ms. Churchill indicated that since the onset of her seizures, her left knee tends to swell; an examination revealed edema in her ankles and calves, and that her left leg was tender anteriorly. (*Id.*) During this visit, she had a chest x-ray performed of the PA and lateral views which showed "[e]ssentially, clear lungs." (R. at 277.) Her Dilantin level was 10.8 $\mu$g/mL.[9] (R. at 316.)

Ms. Churchill returned to Mt. Sinai on April 3, 2003, when as a result of her seizures, she had an EEG performed; the results were normal. (R. at 275.) On August 10, 2005, Ms. Churchill visited the emergency room after having suffered a seizure that day. (R. at 408.) An examination revealed that her left ankle was swollen and her left knee and left foot were tender. (*Id.*) Consequently, she had an x-ray done of her left knee which showed the presence of degenerative joint disease and suprapatellar effusion. (R. at 471.) She was diagnosed as having a seizure disorder and degenerative joint disease in her left knee. (R. at 408.) Her Dilantin level was checked; it was 1.4 $\mu$g/mL. (R. at 528.)

---

[9]  Ms. Churchill sometimes had her Dilantin serum levels checked on occasions when she was not admitted to the hospital or seen in the clinic. Indeed, she had her blood checked on September 17, 2003; August 25, 2004; and August 25, 2005. (R. at 298, 526, 529.) On these dates, her levels were 7.7 $\mu$g/mL; 6.8 $\mu$g/mL; and 7.4 $\mu$g/mL, respectively. (*Id.*)

17

On September 20, 2006, Plaintiff again visited the hospital, this time because she had fallen and hit her head; she was also experiencing right knee and left leg pain. (R. at 516.) On examination, her right knee and left tibia were tender. (R. at 517.) While there, Plaintiff had a CT scan of her brain done; the results were normal. (R. at 467.) On that same day, she had a chest x-ray done, the results of which were also normal. (R. at 468.) X-rays taken of her right knee failed to reveal evidence of fracture. (R. at 469.) Nor was there evidence of fracture of her left leg; however, there were degenerative changes seen at the knee joint. (R. at 470.) Her Dilantin level was 6.6 $\mu$g/mL. (R. at 520.)

On October 25, 2006, Plaintiff was admitted to the hospital as a result of a seizure. (R. at 412.) She indicated that her seizures had been under good control for years, but after falling, she began to experience an increase in their frequency. (R. at 474.) The referring physician noted that, although Plaintiff said that she had been taking her anti-seizure medication, it was at a subtherapeutic level when tested. (*Id.*) During her stay, she experienced two seizures. (R. at 413.) In response, a CT scan of Plaintiff's brain was performed on October 25, 2006 – it was normal. (R. at 466.) Additionally, both an MRI scan of her brain and an intracerebral MRA were unremarkable. (R. at 464, 465.) She had an EEG performed on October 27, 2006,

which revealed an "[a]bnormal record in that mild cortical irritability [was] seen, compatible with, but not diagnostic of, a seizure disorder." (R. at 411.) On that same day, her leg was x-rayed and no recent fracture-dislocation was evident. (R. at 463.)

A bilateral lower extremity venous duplex scan performed on October 29, 2006, showed "evidence of acute deep venous thrombosis in the right popliteal, posterior tibial and peroneal veins. The right common femoral and femoral veins as well as the entire left lower extremity exhibit[ed] no signs of acute deep venous thrombosis." (R. at 462.) A November 1, 2006, CT scan of her brain was unremarkable. (R. at 461.) On November 3, 2006, Plaintiff had an EEG performed, the results of which were normal. (R. at 415.) Her Dilantin level was checked on October 25, 26, 29, 30 and November 3 and her levels were 10.5 $\mu$g/mL, 13.1 $\mu$g/mL, 12.3 $\mu$g/mL, 10.5 $\mu$g/mL, and 8.8 $\mu$g/mL, respectively. (R. at 506-07.) She was discharged on November 3, 2006 – her diagnoses being seizure disorder and deep vein thrombosis of the right leg. (R. at 413.)

### D. Sacred Heart Hospital

On April 16, 2004, Ms. Churchill had an MRI scan of her knees done. (R. at 407.) The scan of the right knee showed no meniscus tear and a "[s]light joint effusion and chronic mostly superficial patellar and joint bursitis mostly lateral aspect."

(*Id.*) The scan of the left knee also revealed no meniscus tear and "[c]hronic superficial patellar bursitis significantly more prominent than on the right side with chronic bursitis mostly lateral compartment." (*Id.*) There were "[s]light osteoarthritic degenerative changes with chronic tendinopathy of the quadriceps and patellar tendons." (*Id.*)

On August 5, 2004, Plaintiff had x-rays done of her left knee and left tibia and fibula. (R. at 449.) The x-ray of her left knee showed no fractures or dislocations. (*Id.*) "Mild to moderate osteoarthritic degenerative changes and significant joint effusion" was suspected, as well as patellofemoral bursitis. (*Id.*) There were no fractures or dislocations seen on the x-ray of Ms. Churchill's left tibia and fibula. (*Id.*)

## E. Dr. William Conroy

Dr. William Conroy, the non-examining state agency physician, completed a physical residual functional capacity assessment (RFC) on April 15, 2003. (R. at 331-38.) He indicated that Ms. Churchill could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and found Plaintiff's ability to push and/or pull unlimited, other than the aforementioned limitations. (R. at 332.) He further opined that she could occasionally engage in activities requiring climbing a

20

ramp/stairs, balancing, stooping, kneeling, crouching, and crawling. (R. at 333.) However, Dr. Conroy suggested that Ms. Churchill never climb a ladder/rope/scaffolds. (*Id.*) Dr. Conroy stated that Plaintiff possesses no manipulative, visual, or communicative limitations. (R. at 334-35.) With respect to environmental limitations, he cautioned Plaintiff to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards, "[d]ue to asthma and seizures." (R. at 335.)

Dr. Conroy again completed a physical RFC on June 21, 2004. (R. at 339-46.) His findings were consistent with his previous RFC, except that he found no limitations on Ms. Churchill's ability to balance, stoop, kneel, crouch, and crawl. (R. at 339-46.)

**F. Dr. Michael D. Gross**

Dr. Michael D. Gross examined Ms. Churchill on March 19, 2003, "for the purpose of providing information to the Bureau of Disability Determination Services." (R. at 256.) Plaintiff informed Dr. Gross that she did not remember the last time that she was employed. (*Id.*) She alleged that she was disabled as a result of her asthma and stated that an asthma attack in December 2002 resulted in admission to the hospital; she averages about two hospitalizations each year as a result of this condition. (*Id.*) Her asthma precludes her from walking even one block and

21

she becomes short of breath when ascending a single flight of stairs. (*Id.*) In addition to asthma, she indicated that she began experiencing seizures in December 2002; Plaintiff stated that she had not had a seizure since that time. (*Id.*) Finally, Ms. Churchill informed Dr. Gross that she suffers from arthritis in her left knee that had worsened since December; though it limited her, she was able to walk approximately one block. (*Id.*)

Upon physical examination, Dr. Gross noted that Plaintiff "related effectively and promptly throughout the examination." (R. at 257.) He opined that she did not appear to be in distress, nor did he believe that she suffered from any mood or thought disorder. (*Id.*) As a result of "bilateral wheezes with poor air entry," Ms. Churchill was unable to lie flat without experiencing shortness of breath. (*Id.*) In addition, her left knee was slightly swollen and minimally tender. (R. at 258.) Consequently, Plaintiff stated that she could not squat or bend over, nor was she able "to do the tandem gait or heel and toe walking." (*Id.*) She did not, however, require a device to ambulate and experienced no difficulty getting on and off the examination table. (*Id.*)

Though Dr. Gross noted that Ms. Churchill "had a poor fund of knowledge," he concluded that "[h]er recent and remote memory was intact" and "[s]he was able to concentrate and maintain her attention span." (*Id.*) And though she was cooperative with Dr.

Gross, a technician that worked with Ms. Churchill opined that she had good comprehension, though she cooperated poorly and gave a poor effort. (R. at 258-59.) This claim was allegedly bolstered by the results of her pulmonary function tests. (R. at 259.) The clinical impressions of Dr. Gross were 1) "[a]sthma with findings of wheezes in both lung fields" and 2) arthritis in her left knee. (Id.)

## G.  *Nicolette Puntini, Ph.D., P.C.*

On June 1, 2007, Dr. Nicolette Puntini performed a psychological examination of Ms. Churchill at the request of her attorney. (R. at 555.) At the time of the evaluation, Plaintiff was depressed, quiet, subdued, and withdrawn. (R. at 556.) When asked why she was unable to work, Ms. Churchill implicated her physical problems and also cited depression. (Id.) Plaintiff said that she has suffered from seizures since 2003; her most recent seizure was a month prior to her visit with Dr. Puntini. (R. at 556-57.) Because the seizures drain her, Ms. Churchill said that she must sleep for an extended period following a seizure. (R. at 557.) Further, the seizures have resulted in Plaintiff being sad, unhappy, and discouraged for the past several years. (R. at 558.) These feelings, along with other feelings of depression, cause her to cry frequently and experience suicidal ideation. (Id.) In addition, her depression precludes her from sleeping well at night. (Id.)

Ms. Churchill also stated that she suffers from asthma and has since she was five years old. (R. at 558.) This condition results in her experiencing shortness of breath when walking for extended distances, climbing stairs, and becoming upset. (*Id.*) Additionally, she stated that she has memory impairments. (R. at 559.) Indeed, she indicated that she frequently misplaces things and has to "tear up the house" to find them. (*Id.*) She is unable to memorize things, she said, and is embarrassed by her lack of memory. (*Id.*) Though she must write down dates and times for her appointments, she stated that she is able to remember to take her medication because she does not want to experience a seizure. (*Id.*)

Ms. Churchill stated that she has difficulty concentrating and maintaining attention. (*Id.*) And though she reported her psychological problems to her physician, he did not prescribe medication for her. (*Id.*) While she had been outgoing in the past, she stated that she had become reclusive as of late, due to her psychological problems. (R. at 560.) Her only relationships are with members of her immediate family. (*Id.*)

Dr. Puntini opined that Ms. Churchill's Full-Scale IQ is 61, Verbal is 64, and Performance is 63. (R. at 562.) She stated that Plaintiff is capable of reading at a fourth-grade level and spells at a second-grade level. (R. at 564.) Dr. Puntini concluded that test results indicate that Plaintiff suffers from

a Major Depressive Disorder and memory impairments. (R. at 565.)
Though other results indicate that Plaintiff functions in the
mentally retarded range of intelligence, Dr. Puntini opined that
this could be, in part, related to Plaintiff's difficulty in
maintaining persistence and pace during the testing period. (R.
at 566.) It was Dr. Puntini's opinion that Ms. Churchill's
"severe psychological problems would interfere with her ability
to maintain concentration, persistence, and pace on routine job
instructions for any appreciable length of time." (Id.)
Further, "[h]er low tolerance for frustration, irritability, and
social withdrawal would interfere with her ability to maintain
occupational relationships with coworkers, supervisors, and the
general public on a sustained basis." (Id.)

Based on the evaluation, Dr. Puntini opined that Ms.
Churchill meets listing 12.04 for affective disorders. (R. at
567.) In making this determination, she cited anhedonia or
pervasive loss of interest in almost all activities, appetite
disturbance with change in weight, sleep disturbance, feelings of
worthlessness, difficulty concentrating or thinking, and thoughts
of suicide. (R. at 570.) Additionally, she opined that
Plaintiff has moderate restriction of activities of daily living.
(R. at 577.) Ms. Churchill also experiences marked difficulties
in maintaining social functioning as well as concentration,
persistence, or pace. (Id.) Dr. Puntini stated that Ms.

Churchill will likely suffer from one episode of decompensation which will last for an extended period. (*Id.*)

Dr. Puntini also completed a Mental RFC. (R. at 581.) In discussing Ms. Churchill's understanding and memory, she opined that Plaintiff is moderately limited in both her ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions; she is markedly impaired in her ability to understand and remember detailed instructions. (*Id.*) With respect to Plaintiff's sustained concentration and persistence, she stated that Ms. Churchill is moderately limited when it comes to carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, and making simple work-related decisions. (*Id.*) Dr. Puntini stated that Ms. Churchill is markedly limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 581-82.)

Further, when it comes to social interaction, she stated

that Ms. Churchill is not significantly limited in her ability to ask simple questions or request assistance. (R. at 582.) However, she is moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*) And she is also markedly limited in her ability to interact appropriately with the general public and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) Finally, when discussing adaptation, Dr. Puntini stated that Ms. Churchill is not significantly limited in her ability to be aware of normal hazards and take appropriate precautions. (*Id.*) However, she is moderately limited in all other areas; specifically, in her ability to respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (*Id.*)

## H. *Dr. Lafayette Singleton*

In a letter dated January 31, 2005, Dr. Lafayette Singleton stated that Ms. Churchill had been unable to work for the past two years as a result of her seizure disorder. (R. at 387.)

On January 10, 2006, Dr. Singleton completed a State of Illinois Department of Human Services Medical Evaluation. (R. at 383-86.) He indicated that he had first seen Ms. Churchill in

2003 and that she visits him approximately 1-2 times per month. (R. at 383.) He noted that Plaintiff suffers from epilepsy; she experiences generalized seizures 1-2 times per month and partial complex seizures 1-2 times per week. (R. at 383, 385.) She was hospitalized in August 2004. (R. at 383.) In an effort to treat her condition, Plaintiff takes Dilantin and Keppra. (*Id.*)

Dr. Singleton opined that Ms. Churchill is at a level of up to 20% reduced capacity with walking, standing, speaking, travel, fine manipulations, gross (grasping manipulations), and finger dexterity (both right and left). (R. at 386.) Additionally, he stated that she is at 20-50% reduced capacity in her ability to bend, turn, push, pull, and perform physical activities of daily living. (*Id.*) With stooping, sitting, and climbing, Ms. Churchill's ability is at more than 50% reduced capacity. (*Id.*) Dr. Singleton suggested that she not perform any lifting. (*Id.*)

## I.   Dr. T.H. Sung[10]

Ms. Churchill visited Dr. Sung on December 27, 2001; she was wheezing during the visit and he assessed that she suffers from, *inter alia*, bronchial asthma. (R. at 420.) When she returned on

---

[10] Ms. Churchill also visited Dr. Sung on January 10, 2002; May 23, 2002; July 23, 2002; October 24, 2002; November 10, 2003; December 12, 2003; March 9, 2004; June 4, 2004; November 6, 2004; March 10, 2005; April 6, 2005; June 23, 2006; August 7, 2006; and February 4, 2007. (R. at 420, 422, 423, 429, 430, 431, 432, 434, 436, 440, 441, 442.) On these dates she complained of ailments unrelated to any of the claims pending before the Court. (*Id.*) Consequently, they will not be discussed.

28

February 22, 2002, she was still wheezing. (R. at 421.)
However, it had resolved when she visited Dr. Sung on April 4,
2002. (*Id.*) Unfortunately, the wheezing had resumed when she
returned on June 27, 2002. (R. at 422.) But was not present
during Plaintiff's August 29, 2002, visit. (R. at 423.) When
she returned to Dr. Sung's office on December 12, 2002, she was
wheezing again. (R. at 423.) She visited Dr. Sung on February
1, 2003, following her first seizure. (R. at 424.) During the
visit, Plaintiff complained of pain and swelling in her left
knee. (*Id.*) On examination, Ms. Churchill was wheezing and her
left knee was stiff when stretched; however, she was able to
walk. (*Id.*) Dr. Sung diagnosed her as suffering from new onset
of a seizure disorder, bronchial asthma, and left knee pain.
(*Id.*) Plaintiff was advised to see a neurologist regarding her
seizures. (*Id.*)

On February 5, 2003, Dr. Sung completed a Respiratory Report
in order that Ms. Churchill's claims under the Social Security
Act be evaluated. (R. at 254-55.) He listed her diagnoses as
bronchial asthma and emphysema and indicated that Ms. Churchill
had been hospitalized for two weeks in 2001, as a result of an
asthma attack. (R. at 254.) Dr. Sung opined that Ms. Churchill
is unable to lift more than 10-20 pounds, has a difficult time
handling heavy objects, and is unable to tolerate traveling in
cold air. (R. at 255.) On February 19, 2003, Plaintiff again

visited Dr. Sung complaining of left knee pain. (R. at 425.) When Plaintiff saw Dr. Sung on March 8, 2003, she indicated that the intensity of her knee pain had decreased and that she had not experienced any seizures. (Id.)

On April 14, 2003, Ms. Churchill visited Dr. Sung and again complained of problems with her left knee. (R. at 426.) She had an x-ray done that showed fluid in the joint space and a periosteal reaction in her upper tibia. (Id.) Dr. Sung assessed Plaintiff as suffering from a left knee injury. (Id.) When she visited the doctor on May 8, 2003, she was wheezing. (Id.) On July 1, 2003, Plaintiff, having again experienced problems with her left leg and knee, visited Dr. Sung. (R. at 427.) She returned on August 5, 2003, after suffering an asthma attack. (Id.)

When Ms. Churchill saw Dr. Sung on October 4, 2003, she was wheezing. (R. at 428.) She returned on November 25, 2003, because she needed asthma medication. (R. at 429.) Plaintiff again saw Dr. Sung on January 14, 2004, for asthma complications. (R. at 430.) When she visited on February 28, 2004, she stated that she had not experienced any seizures. (R. at 431.) She visited on April 23, 2004, for asthma medication. (Id.) On August 4, 2004, Ms. Churchill again experienced problems with her knee and reported them to Dr. Sung. (R. at 432.) Problems with her asthma brought Ms. Churchill back to Dr. Sung's office on

September 3, 2004. (R. at 433.) Her knee was the cause of her visit on October 9, 2004. (*Id.*) Plaintiff had additional visits with Dr. Sung on October 22 and December 6, 2004, and January 14, 2005, for asthma medication. (R. at 434, 435.) On May 6 and June 28, 2005, Plaintiff suffered from asthma-related complications. (R. at 437.) On July 21, 2005, Ms. Churchill complained to Dr. Sung about problems with her knee. (R. at 438.)

When Ms. Churchill visited Dr. Sung on January 17, 2006, she indicated that she had been hospitalized for seizures four times since August 2005. (R. at 439.) She was able to walk with assistance. (*Id.*) She reported on May 9, 2006, that she had not experienced any seizure activity. (R. at 440.) And on December 19, 2006, Plaintiff reported having experienced a seizure and going to the hospital for treatment. (R. at 442.)

On May 15, 2007, Dr. Sung completed a Medical Assessment of Condition and Ability to Do Work-Related Activities. (R. at 455-57.) He stated that he had treated Ms. Churchill since 1985 and that she suffered from, *inter alia*, bronchial asthma, seizure disorder, and osteoarthritis of the knees. (R. at 455.) She has suffered from asthma since she was five-years old, seizures since 2003, and osteoarthritis since 2004. (*Id.*) Her asthma condition had not changed since he began treating her. (*Id.*) And though he opined that her seizure disorder was better, he stated that it

was still on and off, even with medication. (*Id.*) He stated that Plaintiff can stand/walk for about an hour uninterrupted. (R. at 456.) Though he did not know how many hours Ms. Churchill could stand/walk in an 8-hour workday, he opined that she is unable to stand/walk for at least six hours out of an 8-hour workday. (*Id.*) Further, Dr. Sung opined that Plaintiff can sit for a half-hour uninterrupted. (*Id.*) She is unable to sit for at least six hours in an 8-hour work day, though he was unsure as to how many hours she could actually sit. (*Id.*) He stated that Ms. Churchill can lift 10 pounds occasionally and 2-3 pounds frequently. (*Id.*) And can occasionally carry 2-3 pounds for 50-70 feet and frequently carry less than one pound. (*Id.*) It was Dr. Sung's opinion that she can bend and push and pull, though not much. (*Id.*) He further indicated that she can grasp, handle, and manipulate objects and reach, see, hear, and speak. (R. at 456-57.) Dr. Sung stated that Ms. Churchill cannot tolerate dust nor high humidity. (R. at 457.)

### J. Dr. Arjmand Towfig

Dr. Arjmand Towfig, a non-examining state agency physician, completed a physical RFC on April 13, 2005. (R. at 367A.) He listed Ms. Churchill's primary diagnoses as history of seizure disorder and asthma; her last seizure had occurred in June 2004 and her lung exam was normal. (R. at 361, 367A.) He noted no exertional, manipulative, visual, or communicative limitations.

32

(R. at 362, 364, 365.) Further, he opined that Plaintiff can frequently engage in activities requiring the climbing of a ramp/stairs, balancing, stooping, kneeling, crouching, and crawling. (R. at 363.) However, Dr. Towfig suggested that Ms. Churchill never climb a ladder/rope/scaffolds. (*Id.*) With respect to environmental limitations, he recommended that she avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards; she was unlimited otherwise. (R. at 365.)

## 4. The ALJ's Decision

On September 25, 2007, the ALJ, applying the five-step analysis, 20 C.F.R. § 404.1520, found at step 1 that Ms. Churchill had engaged in disqualifying substantial gainful activity (SGA) after November 1, 2002, her alleged onset date; however, she did not do so after August 1, 2005. (R. at 14-15.) While this fact alone requires a finding that Ms. Churchill was not disabled during the time that she performed the SGA, the ALJ continued her evaluation to determine whether she was disabled at anytime thereafter. (R. at 15.) At step 2, the ALJ found that Ms. Churchill suffers from severe impairments, including asthma, a seizure disorder, and arthritis. (*Id.*) However, the ALJ then found at step 3 that none of Ms. Churchill's impairments - alone or in combination - met or medically equaled any of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1,

33

including sections 1.03, 3.02, 3.03, 11.02, and 11.03. (*Id.*) In so finding, the ALJ noted that Ms. Churchill had not often required emergency care for severe asthma attacks and also stated that the results of her pulmonary function tests were superior to those required under the statute. (R. at 16.) Further, she did not experience frequent seizures though compliant with her medication. (*Id.*) And she had failed to provide documentation that she was unable to ambulate. (*Id.*)

In assessing Plaintiff's RFC, the ALJ determined that Plaintiff "has the physical RFC to perform close to the full range of sedentary work," with explicit limitations. (R. at 17.) Specifically, the ALJ opined that Ms. Churchill "can lift and carry up to 10 pounds occasionally, can stand and/or walk for up to two hours in a workday, and can sit throughout a workday, with typical breaks." (*Id.*) The ALJ opined that Plaintiff could not do constant repetitive pushing or pulling against resistance with her lower left extremity because of her history of left knee pain. (*Id.*) And her seizure disorder, the ALJ found, precludes her from ever climbing ladders, ropes or scaffolds; working on moving or unstable surfaces; driving a vehicle; or working at unprotected heights or around unguarded hazardous equipment. (*Id.*) Further, Plaintiff can "only occasionally climb ramps or stairs, stoop, kneel, crouch or crawl, and should not perform work that would expose her to extremes of temperature, humidity

34

or concentrated irritants." (*Id.*) The ALJ held that Ms. Churchill has normal ability to use her upper extremities. (R. at 18.) Lastly, she noted that Ms. Churchill's seizures were not so frequent that they would interfere with her ability to sustain attendance, and that she would only rarely be distracted by pain, fatigue, depression, or any other distraction. (*Id.*)

In explaining these findings, the ALJ noted that neither Dr. Singleton nor Dr. Sung had diagnosed or treated Plaintiff for any mental or emotional problems. (R. at 28.) Though she could not find support for parts of Dr. Sung's partial RFC opinions in his contemporaneous records, she gave them "some credit." (*Id.*) The ALJ also noted that Dr. Singleton's physical RFC opinion regarding Ms. Churchill's marked limitations are not supported by his progress notes. (R. at 29.) For various reasons, the ALJ gave only "limited weight" to the opinions of Dr. Puntini. (*Id.*) Specifically, the ALJ noted that Dr. Puntini had only seen Plaintiff once and failed to review Plaintiff's extensive medical records before the evaluation. (*Id.*) Further, the ALJ found that Dr. Puntini's diagnosis of a major depressive disorder was not supported by treatment records of physicians that had treated Plaintiff for many years. (*Id.*) The ALJ did, however, adopt portions of various RFC opinions regarding seizure precautions, that were provided by the state agency physicians. (R. at 29.) With regard to Plaintiff's arthritis, the ALJ found that she was

35

more limited than she was at the time of the most recent state agency review; therefore, she reached a different conclusion than the state agency physician. (*Id.*)

Further, the ALJ noted that, though Ms. Churchill's impairments could be expected to produce some of the symptoms that she alleged, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully consistent with nor well-supported by the other extensive evidence of record." (R. at 31.) The ALJ specifically cited Plaintiff's testimony regarding the frequency of her seizures and her testimony regarding her extended postictal period and noted that they are not supported by documentation contained in the record. (R. a 32.) Additionally, the ALJ cited Plaintiff's assertions that she had never run out of or forgotten to take her seizure medication, though this is directly contradicted on numerous occasions throughout the record. (*Id.*) Ms. Churchill's credibility, the ALJ found, was also adversely affected by "numerous inconsistences among the various forms, and additional inconsistencies" in her testimony. (*Id.*) She also noted Plaintiff's failure, despite multiple requests, to disclose her part-time employment. (R. at 33.) Further, the ALJ was not convinced of Ms. Churchill's lapses in memory during the hearing. (*Id.*)

At step 4, the ALJ found that Ms. Churchill is capable of

performing past relevant work as a receptionist.  (R. at 34.)
Therefore, the ALJ held that Plaintiff is not disabled as defined
by the Social Security Act.  (R. at 35.)

## Standard of Review

A district court reviewing an ALJ's decision must affirm if
the decision is supported by substantial evidence and is free
from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290
F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "more
than a mere scintilla"; rather, it is "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."  *Richardson v. Perales*, 402 U.S. 389, 409 (1971).
In reviewing an ALJ's decision for substantial evidence, the
Court may not "displace the ALJ's judgment by reconsidering facts
or evidence or making credibility determinations."  *Skinner v.
Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.
Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  Where conflicting
evidence allows reasonable minds to differ, the responsibility
for determining whether a claimant is disabled falls upon the
Commissioner, not the courts.  *Herr v. Sullivan*, 912 F.2d 178,
181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the
record, she must articulate her analysis by building an "accurate
and logical bridge from the evidence to [her] conclusion" so that
the Court may afford the claimant meaningful review of the SSA's

37

ultimate findings. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand. *Sims v. Barnhart*, 309 F.3d 424, 429 (2002).

## **SOCIAL SECURITY REGULATIONS**

An individual claiming a need for POD, DIB, and SSI must prove that she has a disability under the terms of the Social Security Administration (SSA). In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden

shifts to the Commissioner. (*Id.*)

**DISCUSSION**

Ms. Churchill argues that the ALJ's decision must be reversed or remanded because: (1) the ALJ failed to give controlling weight to the opinions of her treating general practitioner and neurologist, (2) the ALJ rejected an examining psychologist's opinion that she suffers from depression, (3) the ALJ selectively quoted from the record, and (4) the ALJ's Step 5 determination is not supported by substantial evidence. The Court will examine these arguments in turn.

**1. The ALJ's Consideration of Evidence from Treating Physicians**

Ms. Churchill argues that the opinions of Dr. Singleton and Dr. Sung that she is unable to work is entitled to controlling weight because, as Ms. Churchill's treating physicians, they have a "longitudinal history" with her. Further, she maintains that this is appropriate as no evidence contradicting said opinions is contained in the record. Conversely, the Commissioner asserts that the opinions of the treating sources are inconsistent with the record as a whole and that the ALJ reasonably discounted them. The Commissioner further contends that the ALJ did adopt parts of the opinions and adequately explained her reasoning for declining to adopt each in its entirety.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight

if it is well supported by medical findings and not inconsistent with other substantial evidence." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(citing 20 C.F.R. § 404.1527(d)(2). Internal inconsistencies in a treating physician's opinion may provide good cause to deny it controlling weight. 20 C.F.R. § 404.1527(c)(2); *Clifford*, 227 F.3d at 871. Additionally, controlling weight need not be given where the physician's opinions are inconsistent with the physician's treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Indeed, the weight afforded the opinion of a treating physician must balance all of the circumstances, with the realization that, though a treating physician has spent more time with the claimant, the physician may also "bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)(citations omitted). However, when denying controlling weight to the opinion of a treating physician, the ALJ must minimally articulate her reasons for doing so. *Clifford*, 227 F.3d 870(citing *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

In the case at bar, the ALJ discounted the opinions of Dr. Singleton and Dr. Sung to the extent that they opined that Ms. Churchill is limited in her ability to sit for extended periods

40

of time, and Dr. Singleton's assertion that Plaintiff is
precluded from working because she experiences seizures.
Specifically, the ALJ was not convinced by either Dr. Sung's
conclusion that Ms. Churchill is unable to sit for more than
thirty minutes at a time, or Dr. Singleton's finding that she is
limited by greater than 50% in her ability to sit.  In making
this determination, the ALJ stated that both Dr. Sung's and Dr.
Singleton's progress notes fail to support such limitations.  The
Court agrees.  Indeed, a review of Dr. Sung's treatment notes
(spanning greater than five years) failed to disclose a single
instance, save for an assessment completed shortly after
Plaintiff's initial hearing before the ALJ, where he discusses
any limitations whatsoever on Plaintiff's ability to sit.  And
though, in the evaluation at issue, he opined that Plaintiff was
unable to sit for at least six hours in an eight hour work day,
he conceded that he was unsure as to how long she could actually
sit during this period.  Additionally, the Court finds
significant Dr. Sung's failure to detail any restrictions on
Plaintiff's ability to sit when explicitly asked to do so in
2003.  Similarly, there are no references to any limitations on
Plaintiff's ability to sit in any of Dr. Singleton's notes aside
from the one instance on a form completed for Ms. Churchill's
application for state benefits.

The ALJ also referenced Plaintiff's own testimony that she

is not limited in her ability to sit. To be sure, Ms. Churchill testified that she is comfortable when seated - an assertion bolstered by the fact that she attends a weekly church service that lasts approximately three and a half hours. Further, she stated that each day, she "usually sit[s] around." And when asked on several occasions why she felt that she could not work, having been recently or in some instances currently employed as a receptionist (a sedentary position), she cited a number of reasons, none of which was that she was unable to sit for long periods.

Nor was the ALJ persuaded by Dr. Singleton's statement that Ms. Churchill is unable to work as a result of her seizure disorder, as she was working as a part-time receptionist during the time when he made this assertion. Additionally, the Court finds that the physician's opinion that Plaintiff suffers generalized seizures 1-2 times each month and partial complex seizures 1-2 times every week, is not supported, and is indeed, contradicted by the record. To be sure, Plaintiff's medical records reveal that she oftentimes goes long intervals without experiencing seizures. For example, in April 2007, she reported that she had experienced her last seizure in February of the same year. Similarly, she stated that she suffered a seizure in November 2005, but did not experience another until September of the following year. This is also consistent with Ms. Churchill's

attendance record when working for Dr. Sung. Though she had been diagnosed as suffering from seizures during that period, she did not miss a single day of work.

It is true, as Plaintiff argues, that the ALJ cannot "play doctor." However, this is not what the ALJ did in this case. Indeed, both Dr. Conroy (twice) and Dr. Towfig indicated that Ms. Churchill is capable of performing light work with restrictions - limitations which were incorporated into the RFC provided by the ALJ. The ALJ adopted the RFC opinions of these physicians, and considering the facts of this case, she was permitted to do so. *Clifford*, 227 F.3d at 870 ("[A]n ALJ must not substitute [her] own judgment for a physician's opinion *without relying on other medical evidence or authority* in the record.") (emphasis added). Consequently, the Court finds that the ALJ's decision to afford less than controlling weight to the opinions of Dr. Singleton and Dr. Sung was reasonable and sufficiently articulated.

## 2. The ALJ's Determination Regarding Plaintiff's Depression Diagnosis

Ms. Churchill next contends that the ALJ erred in finding that her depression did not meet the requirements outlined by the statute.

To establish entitlement to disability or SSI, a claimant must prove that she is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

43

which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423.

The ALJ found that a review of the record failed to reveal sufficient evidence that Ms. Churchill suffered from depression for at least twelve months. The Court agrees. Though Plaintiff submitted medical records detailing countless visits to medical professionals and facilities, only two make any mention of Plaintiff being depressed or experiencing symptoms characteristic of the illness. Specifically, Plaintiff complained of depression during her visit to Dr. Singleton in December 2003. However, as discussed *supra*, Plaintiff engaged in disqualifying SGA until August 2005. Consequently, the complaint made in December 2003 is of no moment. However, even if the Court considered the complaint made in 2003, there is not a single, subsequent visit to any doctor in an attempt to treat it or even any follow-up visits regarding depression to the doctor that noted her initial complaint.

After the 2003 complaint, there is no record of any additional, similar complaints until Plaintiff's evaluation by Dr. Puntini in June 2007 and even then, this is the only other instance noted in the record. The Court notes that this visit occurred only a month prior to Ms. Churchill's second hearing before the ALJ. Indeed, depression was not even raised as an alleged impairment until June 2007, when Plaintiff's counsel

referred her for a psychological examination, though this is of no consequence to the Court's determination. The Court reaches its conclusion solely because a finding that Plaintiff has suffered from depression for the duration required by the statute is simply not supported by the record. Post August 2005, the only diagnosis of depression was rendered slightly less than four months before the ALJ rendered her decision – not the twelve months that the regulation dictates. And the diagnosis was made by a psychologist that had only seen Ms. Churchill on one occasion. In contrast, Dr. Gross, a physician that also examined Plaintiff only once, opined that she did not suffer from a mood disorder.

While Plaintiff argues that Dr. Sung, as her treating physician and employer, was "uniquely situated to evaluate [her] from a medical prospective while also actually observing her," the Court notes that his progress notes do not include a single notation regarding her suffering from depression or any of its symptoms. And though she implies that it was implausible for her to seek treatment for her depression from, or even report it to, a doctor not trained to treat it, the Court notes that she reported a seizure to Dr. May, a physician that had previously only treated problems with her asthma, legs, and feet.

The Court agrees with the ALJ that Ms. Churchill frequently visited a variety of physicians and medical facilities regarding

a myriad of health problems and concerns. These healthcare providers, at least as it appears from their treatment notes, were very attentive in addressing her concerns. That there are only two documented instances, one of which is from a clinical psychologist that had only seen Plaintiff once approximately four months prior to the ALJ's decision, is not sufficient to support a finding that Plaintiff was indeed suffering from depression for the requisite period. Consequently, the Court finds that Plaintiff's depression does not meet the twelve month requirement imposed by the statute.

## 3.    The ALJ's Review of the Record

Plaintiff next challenges the comprehensiveness of the ALJ's review of the evidence. Specifically, she maintains that the ALJ selectively quoted evidence from the record that supports her findings, but failed to address Dr. Puntini's report which, she alleges, supports her disability claim.

The ALJ is not required to "evaluate in writing every piece of testimony and evidence submitted." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)(citing *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985). However, she "must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits." (*Id.*) If the opinion assures the Court that "the ALJ considered the important evidence, and the opinion enables [the Court] to trace the path of the ALJ's reasoning, the

46

ALJ has done enough." (*Id.*)

In reaching her decision, the ALJ considered Dr. Puntini's report regarding Plaintiff's alleged depressive disorder and limitations. However, she declined to afford the psychologist's opinion controlling weight, opting instead to consider it only on a limited basis. The ALJ cited numerous reasons for doing so. Specifically, Dr. Puntini had only seen Ms. Churchill once, and did so without reviewing Plaintiff's medical records prior to the evaluation. Further, the ALJ found that Dr. Puntini's diagnosis of depression was not supported by the record. Finally, the ALJ noted that, though Dr. Puntini opined that Plaintiff was unable to work, she "had an apparently successful period of extended part-time work in a medical office more recently than what claimant reported during the interview and testing session." In so doing, she discussed the evidence and her reasons for rejecting it. It is not the role of this Court to second guess her determination. *See Herr*, 912 F.2d at 181.

Plaintiff also argues that, though the ALJ discounted Dr. Puntini's opinion because she had only seen Plaintiff once, she accepted the opinion of Dr. Gross, who also examined Plaintiff on a lone occasion. However, it is clear upon review of the ALJ's opinion that, though she adopted Dr. Gross' opinion that Ms. Churchill was not suffering from a mood or thought disorder, her determination was not based solely on the doctor's opinion.

Indeed, as discussed, *supra*, she noted that Plaintiff had only complained of depression on one other occasion. In addition, the ALJ noted that Ms. Churchill attends weekly church service and choir rehearsals and participates in church functions. These are just a few examples cited in the ALJ's detailed opinion.

Consequently, the Court finds that the ALJ took the evidence into consideration and met the requirements articulated in *Stephens v. Heckler*.

## 4. The ALJ's Step 4 Determination

Ms. Churchill argues that the ALJ's decision that she can work as a receptionist is not supported by substantial evidence. Though the Court believes this argument to be subsumed by at least one of the other three arguments advanced, and has thus been discussed by the Court, it will briefly address it.

It appears that Plaintiff makes this argument based upon a selective reading of the record. Indeed, when the record is considered in its entirety, it is clear that the ALJ's determination that Plaintiff can work is based on substantial evidence as that standard is defined. With regard to her depressive disorder, testimony favorable to Ms. Churchill showed that she indeed suffers from depression and has since 2003. In resolving conflicting evidence, however, the ALJ took into account documentation contained in the record that did not

48

necessarily favor Ms. Churchill's application. For example, she considered the dearth evidence supporting such a diagnosis despite Plaintiff's many visits to physicians of varying specialties. Similarly, the ALJ acknowledged evidence that Ms. Churchill's seizure disorder would preclude her from working, namely, Dr. Singleton's report. However, she chose not to adopt his opinion, as she is permitted to do. The Court is not permitted to "reweigh the evidence. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the . . . ALJ." *Herr*, 912 F.2d at 181(citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); *Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988)).

The ALJ also found much of Ms. Churchill's testimony to be incredible – citing numerous inconsistencies between it and documentation contained in the record – and therefore declined to fully credit her subjective complaints. Specifically, the ALJ cited to Plaintiff's testimony regarding extended postictal periods, her testimony regarding her ability to read, and her statements regarding compliance with her medication, to name but a few. The Court must affirm these credibility determinations, having not been proven "patently wrong." *See Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989).

Consequently, the Court finds that Plaintiff failed to

49

demonstrate that the ALJ's decision was not based on substantial evidence.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiff's Motion for Summary Judgment and grants the Commissioner's cross-motion for summary judgment.


Date: September 15, 2009         E N T E R E D:


MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT